**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

INTER-TEL, INC., an Arizona corporation;
And INTER-TEL TECHNOLOGIES, INC., an
Arizona corporation,

        Plaintiffs,

v.                                     Case No.: 8:04CV-02224-T-17MSS

WEST COAST AIRCRAFT ENGINEERING,
INC., a Florida corporation; SCOTT
EVASCHUK, individually and as agent for
West Coast Aircraft Engineering, Inc.;
AMERICAN AIRCRAFT SALES INTERNATIONAL,
INC., a Florida corporation;
THOMAS GIPE, individually, and as agent
for American Aircraft Sales International, Inc.,

        Defendants.
_____/

**ORDER ON DEFENDANT AMERICAN AIRCRAFT SALES INTERNATIONAL, INC.'S**
**MOTIONS FOR SUMMARY JUDGEMENT**

      This cause is before the Court on Defendant American Aircraft Sales International, Inc.'s ("American") Motion for Summary Judgment Directed to the First Amended Complaint's Counts I – V of the Plaintiff Inter-Tel Technologies, Inc. ("Tech"), dated May 31, 2006 (Dkt. No. 53), and accompanying Memorandum in Support of its Motion for Summary Judgment, dated May 31, 2006 (Dkt. No. 54), and Plaintiffs' response thereto, dated July 1, 2006 (Dkt. No. 76). Additionally, this cause is before the Court on American's Motion for Summary Judgment Directed to the First Amended Complaint of the Plaintiff Inter-Tel, Inc. ("Inter-Tel."), dated May 31, 2006 (Dkt. No. 55), and accompanying Memorandum in Support of its Motion for Summary Judgment on First Amended Complaint of Inter-Tel, Inc., dated May 31, 2006 (Dkt. No. 56), and Plaintiff's response thereto, dated July 1, 2006 (Dkt. No. 76).

FACTUAL AND PROCEDURAL HISTORY[1]

In the late 1960s, Steven Mihaylo ("Mihaylo") founded Tech, a company in the business of selling telecommunications hardware and software (SOF #2, 3). Tech, a wholly owned subsidiary handling marketing and sales functions for parent Inter-Tel has grown to more than $450 million in annual sales (SOF #3, 4, 23). Craig Rauchle ("Rauchle") is the president of Inter-Tel, and for the last fifteen (15) years has been president of Tech. (SOF #23). Rauchle has no experience in aircraft operation or maintenance or in purchasing general aviation turbojet aircraft (SOF #56). Mihaylo, a licensed pilot with more than thirty (30) years experience, is not a mechanic (SOF #47).

American Aircraft Sales International, Inc. ("American") is a Venice, Florida based corporation in the business of the acquisition and sales of corporate aircraft including turbo props and jet airplanes, founded by Charles Tolbert ("Tolbert") in 1968 (SOF #1, 30, 34). All written sales documents for the purchase and sale of aircraft are generated by Tolbert, Brian Paul ("Paul"), the Director of Sales, or are provided by the purchasers themselves (SOF #80).

In April 1995, Defendant Scott Thomas Evaschuk ("Evaschuk") was the president and sole owner of West Coast, a Florida corporation (SOF #28). West Coast was in the business of conducting general aviation aircraft inspections, maintenance and repairs (SOF #29). In January 1999, West Coast Aircraft Engineering, Inc. ("West Coast") established a firm policy not to engage in the business of performing pre-purchase inspections for potential buyers or sellers of general aviation aircraft including corporate turbojets (SOF #130).

In October 2002, Mihaylo, the chairperson of the board of directors of both Plaintiffs, Inter-Tel and Tech, received a "cold call-style" telephone call from Thomas Gipe ("Gipe") who introduced himself as an aircraft broker representing American (Dkt. No. 78, Mihaylo Deposition, pg. 27, SOF #24). The two discussed the possibility of one or both of Mihaylo's companies purchasing a corporate aircraft and/or selling any corporate aircraft that it may have owned (SOF #36). According to Gipe, Mihaylo indicated that his company was looking for a

---

[1] For the sake of brevity only, the Court will cite and make reference to Plaintiffs' Statement of Facts in Support of their Opposition to Defendant's Motion for Summary Judgment and In Support of Plaintiffs' Motion for Partial Summary Judgment ("SOF")(Dkt. No. 78). The Court has independently verified that any statement bolstered by an accompanying SOF citation has been alleged in deposition testimony, deposition exhibit, or sworn affidavit.

Learjet 31 ER, a twin turbojet corporate aircraft, one faster and with a greater range (SOF #34) than the current corporate aircraft that Tech owned, a Citation 500, turbo-prop aircraft (Dkt. No 78, Gipe Deposition, pp. 32-35).

In March of 2003, Gipe reported to Mihaylo that American had a potential buyer for Tech's Citation 500 aircraft. Gipe proposed that the Citation 500 be traded in to American in exchange for an available Learjet 31 ER, owned by Alice Walton of Wal-Mart fame (SOF #39, 40). The Learjet 31 ER Serial No. 31-017 ("Learjet") is the subject of this litigation (SOF #34). American obtained specifications and flight information about the Learjet and forwarded them to Mihaylo. Included in the information, American indicated that the Learjet had damage history. (Gipe Deposition, pg. 57-61, Dkt. No. 78, Deposition Exhibit "8", SOF #85).

On or about June 20, 2003, Mihaylo, along with Gipe and Paul, went to Bentonville, Arkansas to look at the Learjet and talk to the maintenance people at Wal-Mart Aviation in order to inspect the Learjet's records (SOF #88). At the time of the inspection, the maintenance personnel were working on a fuel tank leak that required the wings and side panels to be removed to address "corrosion issues" (Vennerbeck Deposition, pg. 18-19, SOF #45). During this visit, Gipe and Paul represented to Mihaylo that the aircraft had been completely rebuilt by Bombardier Aircraft in Canada after it had had a landing mishap. After the accident, the airplane had been disassembled, crated up, shipped off to Bombardier in Canada and rebuilt (SOF #44). Mihaylo reviewed computerized records for about 30-40 minutes; apparently without comprehension (SOF #46). According to the Defendants, Wal-Mart's personnel gave Mihaylo a computer disk containing more information about the history of the aircraft and its maintenance than is reported in Deposition Exhibit #8 (Patrick, pg. 31, 50-51, Dkt. No. 78, Deposition Exhibit "8"). Mihaylo told Gipe and Paul that he would require a thorough pre-purchase inspection to be done of the Learjet before any commitment would be made to purchase it (Dkt. No. 78, Mihaylo Deposition, pg. 42-43).

According to Evaschuk, a pre-purchase inspection for general aviation aircraft is a thorough physical examination of the entire aircraft designed to report an objective, impartial

overview of the aircraft and its records. The maintenance facility conducting the pre-purchase inspection is required to make a written summary of the specific findings from the examination. (SOF #132)

Mihaylo left Arkansas very interested in acquiring the Learjet, but wanted "prebuy inspection" of the airplane, in order to verify that the sales claims were accurate. (Dkt. No. 78, Mihaylo Deposition, pg. 42-43). Mihaylo wished Bombardier Service Center to perform the prebuy inspection (SOF #51). Gipe and Paul pivoted Mihaylo to "their sister company down in Florida, West Coast, that could do [the pre purchase inspection] quicker and probably less expensively" (Dkt. No. 78, Mihaylo Deposition, pg. 43). After receiving several telephone calls from Paul urging Tech to accept American's recommendation of West Coast as the entity to perform the pre-purchase inspection, Mihaylo agreed (SOF #52).

Commencing in late May of 2003, Rauchle became involved with Mihaylo in Tech's search for a Learjet (SOF #57). Prior to June 30, 2003, Paul and Gipe strongly urged Rauchle to utilize West Coast in Sarasota, Florida as the maintenance facility to perform the pre-purchase inspection on the Learjet (SOF #57). Rauchle's definition of a "pre-purchase inspection," a thorough inspection and review of the aircraft, its electrical systems, avionics, and logbooks by an objective third party to identify "squawks" associated with the aircraft and to determine airworthiness, came from subsequent conversations with Gipe (SOF #64).

On June 23, 2003, American submitted a proposed purchase agreement to Rauchle (Dkt. No. 78, Deposition Exhibit "9"). According to Rauchle, Tech wanted a number of changes in the contract (Rauchle Deposition, pg. 50). They were incorporated into the agreement signed by the parties (Dkt. No. 78, Deposition Exhibit "9").

On June 30, 2003, Tech and American entered into a letter of intent agreement, authored by Gipe, that contemplated Tech selling its Citation 500 to American as a trade-in and purchasing the Learjet 31. In the agreement, the parties agreed that the Learjet was being sold "as is, where is" (SOF #91, Dkt. No. 78, Deposition Exhibit "9"). Tech conditioned its obligation to close on certain "due diligence" criteria identified in §4(e) of the agreement. They were:

1. The Learjet's airframe and engine logbooks had to be complete.

2. American had to transfer title to the Learjet free and clear of liens.
3. Inter-Tel had the right to review and approve the aircraft's damage history.
4. The Learjet must be airworthy.
5. Required maintenance must be up-to-date and in compliance with all service Bulletins and Airworthy Directives.
6. The aircraft tendered to Tech must have all systems and equipment operation.

Furthermore, the parties agreed on additional terms and conditions:
1. American agreed to deliver the Learjet to West Coast Engineering at the Sarasota-Bradenton International Airport.
2. Tech had the right to have West Coast perform a pre-purchase inspection at Tech's expense.
3. Upon completion of the pre-purchase, Tech had the right to notify American of any conditions that rendered the aircraft not airworthy
4. American agreed to correct any noted airworthiness conditions up to a total cost of $10,000.00
5. Should the cost of correcting the noted conditions exceed $10,000.00, American could make those corrections at its option. If American choose not to make such corrections, then the earnest money deposited was to be refunded to Tech and the agreement was to be canceled.
6. Upon satisfactory completion of the pre-purchase inspection process, the earnest money deposit became non-refundable.

Tolbert claims he was directly involved in the sale of the Learjet from American to Tech to a minor extent and that Gipe and Paul were handling the sales transaction directly and would give Tolbert periodic progress reports (SOF #104).

Shortly after the Learjet arrived in Florida, Tolbert telephoned Evaschuk at West Coast and told him the Learjet was in the process of being sold through American. In early July, 2003, several days after Tolbert's phone call, Evaschuk received a phone call from Gipe, who identified himself as American's salesman handling the Tech sale. During this and subsequent conversations, Gipe told Evaschuk American wanted certain repairs made to the Learjet, frequently making reference to the work as a pre-purchase inspection. Evaschuk requested Gipe to refrain from using the terminology "pre-purchase inspection", and said that any work done on the Learjet would have to take the form of a standard work order specifying certain maintenance (SOF #136).

On July 31, 2003, Rauchle signed a work request wherein it was requested that West Coast perform the pre-purchase inspection (Dkt. No. 78, Rauchle Deposition, pg. 76).

On August 15, 2003, during the due diligence period, Mihaylo asked American via email about the warranty for the work related to the fuel tank leak repairs completed by the third party hired by Wal-Mart Aviation. Gipe informed Mihaylo that the warranty from the company that completed the fuel repair work would be transferred to Tech. The warranty ran for 120 days following completion of the work plus eight hours of flight time, and expired in November, 2003 (SOF #101).

On August 29, 2003, West Coast reported on the inspection and engines test and billed Tech for the work (Defendant's DX 26). Tech chose to complete the purchase. It notified American and the closing agent on September 4, 2003, when Rauchle faxed instructions to the closing agent (Defendant's DX 30).

On September 9, 2003, Gipe sent Rauchle a fax in which he confirmed that West Coast had completed its work on the Learjet. Gipe alleges that he does not know how he knew West Coast had done the work and never discussed the work on the Learjet with anyone at West Coast (SOF #98). West Coast never performed a logbook review or reviewed any of the aircraft records, logbooks, engine logs, or any other written records relating to the Learjet, and has never produced a document entitled "pre-buy inspection" for the Learjet (SOF #141). Additionally, West Coast has never researched, reviewed or checked the damage history of the Learjet, (SOF #140).

On September 15, 2003, Gipe represented to Rauchle that West Coat had returned the Learjet to American stating that the aircraft was airworthy (SOF #77). A Bill of Sale to the Learjet was delivered by American to Tech, and was recorded with the FAA on September 22, 2004 (Defendant's DX 32).

On October 18, 2003, Tech hired Robert Barron ("Barron") to pilot the aircraft from Sarasota to Phoenix (SOF #143). After being assured by Gipe that the aircraft was in working condition, Barron began a standard pre-flight inspection of the Learjet (SOF #144). There were many defects found during this inspection, most notably faulty oxygen pressure and autopilot systems (SOF #149, 150). Once the oxygen issue was successfully addressed, Barron piloted the Learjet away from Sarasota, confident that it was in airworthy condition (Dkt. No. 78, Barron Deposition, pg. 31). Over the next several days, Tech logged almost twenty (20) hours of flight

time (Dkt. No 78, Barron Deposition, pg. 37). During those flights, Barron was alerted to severe aircraft defects. During one flight, he concluded that there were too many problems to allow the aircraft to remain in the air, and took the Learjet directly to the Bombardier Manufacturing Facility in Tuscon, AZ (SOF #157).

On December 5, 2003, Lorne Shantz ("Shantz"), Chief Pilot responsible for all maintenance work done on the Learjet, called Gipe, complaining about his disappointment at the overall mechanical condition of the aircraft (SOF #162). During December 2003, Shantz was informed by Bombardier that numerous maintenance discrepancies had been discovered and that all or most of them should have been detected and resolved during the pre-purchase inspection process (SOF #168).

Before joining American as a salesperson in June of 2002, Gipe had no experience in aircraft sales nor did he have an FAA pilot or maintenance license, any aircraft mechanical training or background, or experience piloting an aircraft of any type (SOF #33).

Tech spent $157,241.60 for work, service or parts regarding the correction of maintenance deficiencies, systems failures and logbook deficiencies on the Learjet (SOF #171).

STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party..." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The evidence presented must be construed in favor of the non-moving party, and that party must receive the benefit of all favorable inferences that can be drawn from that party's evidence. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The Court's function is not to "weigh the evidence and

determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If the determination of the case rests on which competing version of the facts or events is true, the case should be submitted to the trier of fact. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree on the factual inferences that should be drawn from the facts. *Warrior Tombigbee Transportation Company v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). If any fact exists which could lead a fact-finder to find for the Plaintiffs, then the Defendant's Motion must be denied. *Transcontinental Ins. Co. v. Ice Sys. of Am.*, 847 F. Supp. 947, 949 (D. Fla. 1994). Conversely, if any fact exists which could lead a fact-finder to find for the Defendants, the Plaintiffs' Counter-Motion must be denied. *Id*.

DISCUSSION

I. American's Motion for Summary Judgment against Plaintiff Inter-Tel Tech, Inc.

Defendant American requests this Court to enter Summary Judgment on its behalf for Counts I through V of Tech's first amended complaint. American's motion does not address the fraud and deceptive trade practices claim contained in Plaintiff Tech's first amended complaint.

Plaintiffs' first amended complaint alleges seven counts, on five of which American is requesting Summary Judgment: (I.) breach of contract; (II.) breach of duty; (III.) negligence; (IV.) breach of express warranties; and (V.) breach of implied warranties. The Court will address the facts of each count in turn.

A. Breach of Contract (Count I.)

American claims that no action for breach of contract exists because Tech admits that American sold to it the Learjet. Furthermore, American argues that it is entitled to Summary Judgment because Tech does not claim that American failed to pay for corrective work identified during the due diligence inspection conducted by West Coast.

Plaintiffs counter, claiming that the pre-purchase inspection, a material condition of the sales agreement contract, was not performed on the Learjet. According to the Plaintiffs Evaschuk

8

told Tolbert before the sale contract was completed that West Coast did not and would not perform a pre-purchase inspection on the Learjet. Despite this, the Plaintiffs contend, American chose not to disclose this information and proceeded with the sale, misrepresenting that such an inspection would be done. If the Plaintiffs are to be believed, this failure to perform constituted a breach of contract.

In order to recover on a claim for breach of contract in Florida, a plaintiff must plead facts indicating: 1) the existence of a contract; 2) breach thereof; and 3) damages flowing from the breach. *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042 (1st DCA 1977).

The contract at issue is the "Agreement to Purchase" document (Dkt. No. 78, Deposition Exhibit "9"). Both parties agree that the documents attached to the first amended complaint constitute a contract. American makes no argument in any filed document that Tech did not suffer damages, if the contract was breached. It has gone uncontested that Tech spent $157,241.60 in additional work on the aircraft to bring into compliance with the terms of the contract. Thus, American cannot argue that Plaintiffs have not raised a genuine issue of material fact as to elements 1 and 3 of a claim for breach of contract.

The sole remaining question relating to the breach of contract claim is whether American did, in fact, materially breach the contract. Evaschuk claims in his affidavit that West Coast did not perform a pre-purchase inspection on the Learjet and that American knew before delivering the Learjet to West Coast that it only intended to perform specific work order maintenance. In an affidavit dated July 17, 2006, Tolbert argues this point on its merits, claiming that the work conducted at West Coast contained many of the features of a typical pre-purchase inspection (Dkt. No. 90). There is a material issue of fact as to whether the Learjet had a pre-purchase inspection performed on it as required by the contract, a lynchpin matter that must be resolved before this Court may rule that the contract was or was not breached. Because there is a material issue of fact as to whether a contract existed, that contract was breached, and damages flowed as a result of that breach, summary judgment as to Count I of the Plaintiffs' first amended complaint is improper.

B. Breach of Duty (Count II.)

American claims that since no fiduciary duty arose between itself and Tech, no breach of

that duty could have occurred. American points to the inclusion of the "as is" provision in the contract to show that the parties were dealing at arm's length and that American had no "special, extra-contractual duties" to Tech. Because no evidence has been adduced to expand its duties beyond that of those specified in the contract, American argues, the Plaintiffs have not established enough fact for the second count to survive summary judgment.

Conversely, Plaintiffs claim that they were fraudulently induced to use West Coast when American affirmatively knew before and after the negotiations began that West Coast would not perform "pre-purchase inspections" and that the fraudulent misrepresentations that such an inspection had been completed shows that the sale of the Learjet was based upon the fraud of American. This fraudulent sale, the Plaintiffs argue, gives rise to a constructive trust in American for any proceeds of the sale, including the Cessna Citation, which was traded as partial payment for the Learjet. The Plaintiffs contend that as trustee of the constructive trust, the Defendants have a fiduciary duty to Tech to hold those proceeds for Tech's benefit, which was breached.

A constructive trust is one:

> raised by equity in respect of property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it. Equity will raise a constructive trust where one through actual fraud, abuse of confidence reposed and accepted, or through other questionable means gains something…which in equity and good conscience he should not be permitted to hold. *Turturro v. Schmier*, 374 So. 2d 71, 73-74 (Fla. 3rd DCA 1979) (quoting *Quinn v. Phipps,* 113 So. 419, 422 (1927)).

Under Florida law, the essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation. *Wadlington v. Continental Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005); *Amazon v. Davidson*, 390 So. 2d 383, 385 (Fla. 5th DCA 1980); *Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 641 F.2d 323, 325 (5th Cir. 1981). Generally, the issue of fraud is not properly the subject of summary judgment because a resolution of the issues involved requires an exploration of the relevant facts and circumstances, and thus a court can seldom determine the presence of fraud absent a trial or evidentiary hearing. *State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146 (D. Fla. 2006) (citing *Robinson v. Kalmanson*, 882

So. 2d 1086, 1088 (Fla. 5th DCA 2004)). This is because the questions of actual misrepresentation, intent, knowledge, and reliance all turn on factual determinations, which are often based on circumstantial evidence. *State Farm*, 410 at 1146 (citing *Cohen v. Kravit Estate Buyers, Inc.*, 843 So.2d 989, 991 (Fla. 4th DCA 2003)).

Thus, the issue before the Court is whether American's actions were so fraudulent as to create a constructive trust and accompanying fiduciary duty, which it then breached. Because, as the *Cohen* and *State Farm* courts noted, questions of actual misrepresentation, intent, knowledge, and reliance are subjective, fraud can almost never be the successful subject of a motion for summary judgment. *Cohen*, 843 So.2d at 991. *State Farm*, 410 at 1146. The Plaintiffs raised material issues of fact that make it possible that both Tolbert and Gipe knew prior to delivery in Sarasota that West Coast would not perform a pre-purchase inspection. It is possible that both Tolbert and Gipe knew after the work was completed that the work was not "pre-purchase inspection" quality. The parties agree that American did not make this information available to Tech before the final purchase became effective. As a result, summary judgment as to Count II of the Plaintiffs' first amended complaint is improper.

C. Negligence (Count III.)

American claims that Florida's economic loss rule precludes a claim for negligence arising out of the sale of goods and may not be employed to circumvent contract limitations on warranty claims. Pointing to *Florida Power & Light Co. v. Westinghouse Electric Corp*. American contends that tort law is not a legal remedy in Florida for claims arising out of the sale of goods absent an assertion of personal injury or property damage to property other than the allegedly defective goods. *Florida Power & Light Co. v. Westinghouse Electric Corp.* 510 So.2d 899 (Fla. 1987).

The Plaintiffs counter, arguing that the Florida Supreme Court has recently turned away from "unprincipled extension of the economic loss rule" in *Comptech Int'l., Inc. v. Milam Commerce Park, Ltd.*, and argue that if the controversy arises out of fraudulent inducement and negligent misrepresentation, tort law is a proper remedy in Florida. *Comptech Int'l., Inc. v. Milam Commerce Park, Ltd.*, 759 So.2d 1219 (Fla. 1999).

The economic loss rule is designed to prevent parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort. *Indem. Ins. Co. v. Am. Aviation, Inc.,* 891 So. 2d 532, 536 (Fla. 2004). Damage to a product itself is most naturally understood as a warranty claim. Such damage means simply that the product has not met the customer's expectations, or in other words, that the customer has received "insufficient product value." *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 871 (U.S. 1986). The economic loss rule cannot be used as a barrier to legitimate causes of action whether they are statutory or common law. *Comptech,* 759 at 1225. (fraudulent inducement). A claim for fraudulent inducement constitutes a tort independent from the underlying contract and, therefore, is not barred by the economic loss rule. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996).

As stated above, fraud (including fraudulent misrepresentations) almost never are decided on summary judgment. *Cohen*, 843 So.2d at 991. *State Farm*, 410 at 1146. The issue of whether American fraudulently induced Tech to have the "pre-purchase inspection" performed at West Coast, knowing that West Coast refuses to conduct such inspections, is a matter for a trier of fact. Thus, the issue of whether the economic loss rule precludes the Plaintiffs for pleading negligence is also a matter for a trier of fact. As a result, summary judgment as to Count III of the Plaintiffs' first amended complaint is improper.

D. Breach of Express Warranty (Count IV.)

American contends that, other than ordinary sales puffing, no American employee made any statement that Tech could construe as a warranty. American argues that Mihaylo gave Rauchle complete authority to purchase the Learjet on behalf of Tech, and that Rauchle has testified that he cannot recall anything that Gipe told him about the aircraft. Furthermore, American argues, courts have "consistently barred testimony that would purport to create" an express warranty when the pre-contract statement conflicts with the final written expression between the parties. American points to Uniform Commercial Code parole evidence principles in support of its theory.

The Plaintiffs counter, arguing that the contract shows a "pre-purchase inspection" of the Learjet by an FAA certified mechanic was an integral promise made by the seller in the contract

in order to confirm to its represented "pristine condition." Thus, the Plaintiffs allege that any affirmation of fact or promise made by American relating to the Learjet became part of the basis of the bargain and created an express warranty, as Florida Statute §672.313 specifies. The plaintiffs point to two express warranty breaches: first, the Defendants made an express promise in the contract that the aircraft would be delivered to West Coast Aviation for a "pre-purchase inspection." The breach occurred when no such inspection was conducted, and the defendants, having knowledge, executed the contract regardless. Second, the Defendants made an express promise that the aircraft would be delivered with all systems operational. This breach occurred upon delivery, when not all systems were operational.

According to Fla. Stat. §672.313, a seller can create an express warranty by making an affirmation of fact to the buyer which relates to the goods and becomes part of the basis of the bargain between the parties. *Royal Typewriter Co., Div. of Litton Business Systems, Inc. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1100 (11th Cir. 1983). Furthermore, any description of the goods that is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. *James v. Ashley Adams Antiques, Inc.*, 2006 U.S. Dist. LEXIS 39690 (D. Fla. 2006). It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that the seller have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. *Id*.

Thus, the issue is not whether the Parol Evidence Rule bars Gipe's statements, as American claims, but whether the Plaintiffs have plead facts that indicate that an American official made an affirmation of fact or promise to a Tech official which became part of the bargain. It is clear from Deposition Exhibit "9" that a "pre-purchase inspection" was a part of the bargain between American and Tech. According to deposition testimony, Gipe promised that West Coast, American's sister company, would perform a pre-purchase inspection for Tech at a better price. It is not for this Court to weigh the validity of those statements. Tech has created an issue for a fact-finder to decide whether the parties intended Gipe's statements to become part of the bargain. Intent is generally a matter for a fact-finder . If an express warranty did exist, there

must also be a breach. Tech's pleadings clearly show that some inspection was conducted by West Coast. The finder of fact must decide whether the inspection was of "pre-purchase" quality or some lesser quality constituting a breach. As a result, summary judgment as to Count IV of the Plaintiffs' first amended complaint is improper.

E. Breach of Implied Warranties (Count V.)

For their final argument, American claims that in Florida, there can be no implied warranty of fitness when the parties agree that the buyer takes the goods "as is." American points to Fla. Stat. §672.316(3)(a) for the basis of its argument: unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is." American argues that the burden falls on Tech to produce evidence that the "as is" term was not intended as a disclaimer of all implied warranties. American points to Fla. Stat. §672.316(3)(b) another basis of its argument: when Tech, before entering into the contract, examined the goods as fully as was desired, there is no implied warranty with regard to the defects which an examination might have revealed. Mihaylo, a pilot with more than thirty years experience, had full access to the Learjet's maintenance and service records, and was informed during the June 20, 2003 inspection about the Learjet's fuel tank leak problems, exterior corrosion and damage history. There was also an inspection done by West Coast on behalf of Tech and paid for by Tech. American argues that all matters about which Tech now complains (fuel tank leak problems, auto-pilot performance) were all known to Tech before taking delivery of the aircraft. Furthermore, American claims that an implied warranty of merchantability cannot arise because Tech did not purchase the aircraft for resale.

Not surprisingly, Plaintiffs contend otherwise. Plaintiffs argue that an implied warranty attached to the Learjet upon sale: that it was fit for flight, that it had been thoroughly inspected, and that all reasonably known defects in both the airplane and its paperwork had either been identified or repaired. Plaintiff bases its claim for implied warranty of fitness on American's negligence, breach of contract, and/or fraud – one or all of which deprived them of the desired pre-purchase inspection.

Florida law authorizes sellers to exclude warranties, both express and implied, in the sale of goods. *Ames v. Winnebago Indus., Inc.*, 2005 U.S. Dist. LEXIS 35226 (D. Fla. 2005).

Exclusion or modification of the implied warranty of merchantability must have accompanying language that mentions merchantability and in case of a writing must be conspicuous. Fla. Stat. § 672.316(2). To exclude or modify any implied warranty of fitness, the exclusion must be by a writing and conspicuous. *Id*. Furthermore, unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is." Fla. Stat. § 672.316(3)(a). *Earman Oil Co. v. Burroughs Corp.*, 625 F.2d 1291, 1296 (5th Cir.-OLD 1980). When the buyer, before entering into the contract, has examined the goods as fully as he or she desired, there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him or her. Fla. Stat. § 672.316(3)(b). *David v. Davenport*, 656 So. 2d 952, 953 (Fla. 3rd DCA 1995).

Thus, the issues are whether the "as is" provision contained in the purchase agreement is conspicuous enough to exclude an implied warranty of fitness, and whether American's failure to disclose the quality of West Coast's inspection thwart that exclusion.

The parties' offer to purchase agreement reads as follows: "Both aircraft will be sold "as is, where is", subject to both aircraft meeting the following conditions:…" (Dkt. No. 78, Deposition Exhibit "9"). No reasonable person could conclude that a material issue of fact exists as to whether the "as is" was conspicuous in the purchase agreement. The provision is the initial term in the purchase agreement following sale price. It is set a part from subsequent terms and is plainly worded. Furthermore, Rauchle admitted to modifying the terms of the agreement before signing it – the "as is" provision did not change throughout later drafts of the agreement. Clearly, the provision was conspicuous and meant to be part of the agreement between the parties. However, the contract also calls for certain conditions precedent. One such condition calls for the aircraft to be delivered with all systems and equipment operational. Another is that there a pre-purchase inspection must be a satisfactorily completed in order to determine aircraft airworthiness. The completion of the pre-purchase inspection and American's knowledge thereof is decidedly material. If an implied warranty of fitness did exist, there must also be a breach. Tech's pleadings clearly show that the airplane was delivered in a less than pristine condition. A finder of fact must decide whether the Learjet's condition rose to the level of breach.

It is unclear whether the Plaintiffs raise a claim for breach of implied warranty of merchantability as well. For the purposes of this order, this Court will assume that they do. An airplane is not a one-time use commodity. A well maintained or restored airplane may continue to be useful for years. There will always be a market for pre-owned, but reliable goods. Facts have been plead showing Tech's willingness to trade assets. It is conceivable for a fact-finder to find that Tech wished its investment in the Learjet to follow a similar path as its investment in the Cessna. Furthermore, no provision in the purchase agreement specifically excludes the implied warranty of merchantability, as required by Florida statute. Fla. Stat. § 672.316(2). As a result, no implied warranties have been excluded and summary judgment as to Count V of the Plaintiffs' first amended complaint is improper.

II. Defendant's Motion for Summary Judgment against Plaintiff Inter-Tel, Inc.

Defendant American requests this court to enter a Summary Judgment on its behalf against Inter-Tel's first amended complaint. The Plaintiffs concede that entry of Summary Judgment is proper as to Inter-Tel, Inc. As a result, summary judgment as to Counts I-VII of the Plaintiffs' first amended complaint will be entered as to Inter-Tel, Inc.

CONCLUSION

Thus, it is clear, having read the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that Plaintiff Tech has raised genuine issue of material fact as to its claims for breach of contract, breach of fiduciary duty, negligence, breach of express warranty, and breach of implied warranty. Accordingly, it is:

**ORDERED** that Defendant's motion for summary judgment against Plaintiff Inter-Tel Tech, Inc. and accompanying memorandum in support of summary judgment (Dkt Nos. 53 and 54) be **DENIED**. Further, Defendant's motion for summary judgment against Plaintiff Inter-Tel,

Inc. and accompanying memorandum in support of summary judgment (Dkt Nos. 55 and 56) be **GRANTED** and Inter-Tel, Inc. be dismissed from their cause of action.

**DONE AND ORDERED** in Chambers at Tampa, Florida, this 15th day of November, 2006.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record