**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

INTER-TEL, INC., an Arizona corporation;
And INTER-TEL TECHNOLOGIES, INC., an
Arizona corporation,

        Plaintiffs,

v.                                                              Case No.: 8:04CV-02224-T-17MSS

WEST COAST AIRCRAFT ENGINEERING,
INC., a Florida corporation; SCOTT
EVASCHUK, individually and as agent for
West Coast Aircraft Engineering, Inc.;
AMERICAN AIRCRAFT SALES INTERNATIONAL,
INC., a Florida corporation;
THOMAS GIPE, individually, and as agent
for American Aircraft Sales International, Inc.,

        Defendants.
_____/

**ORDER ON PLAINTIFFS INTER-TEL, INC.'S, AND INTER-TEL TECHNOLOGIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGEMENT**

This cause is before the Court on Plaintiff Inter-Tel, Inc.'s ("Inter-Tel") and Plaintiff Inter-Tel Technologies' ("Tech") Motion for Partial Summary Judgment, dated June 30, 2006 (Dkt. No. 73), Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Partial Summary Judgment, dated June 30, 2006 (Dkt. No. 74), Defendant American Aircraft Sales International, Inc.'s ("American") response thereto, dated July 27, 2006 (Dkt. No 85), and Defendant American's supplement to its response, dated August 28, 2006 (Dkt. No. 89).

FACTUAL AND PROCEDURAL HISTORY[1]

In the late 1960s, Steven Mihaylo ("Mihaylo") founded Tech, a company in the business of selling telecommunications hardware and software (SOF #2, 3). Tech, a wholly owned subsidiary handling marketing and sales functions for parent Inter-Tel, has grown to more than $450 million in annual sales (SOF #3, 4, 23). Craig Rauchle ("Rauchle") is the president of Inter-Tel, and for the last fifteen (15) years has been president of Tech. (SOF #23). Rauchle has no experience in aircraft operation or maintenance or in purchasing general aviation turbojet aircraft (SOF #56). Mihaylo, a licensed pilot with more than thirty (30) years experience, is not a mechanic (SOF #47).

American Aircraft Sales International, Inc. ("American") is a Venice, Florida based corporation in the business of the acquisition and sales of corporate aircraft including turbo props and jet airplanes, founded by Charles Tolbert ("Tolbert") in 1968 (SOF #1, 30, 34). All written sales documents for the purchase and sale of aircraft are generated by Tolbert, Brian Paul ("Paul"), the Director of Sales, or are provided by the purchasers themselves (SOF #80).

In April 1995, Defendant Scott Thomas Evaschuk ("Evaschuk") was the president and sole owner of West Coast, a Florida corporation (SOF #28). West Coast was in the business of conducting general aviation aircraft inspections, maintenance and repairs (SOF #29). In January 1999, West Coast Aircraft Engineering, Inc. ("West Coast") established a firm policy not to engage in the business of performing pre-purchase inspections for potential buyers or sellers of general aviation aircraft including corporate turbojets (SOF #130).

In October 2002, Mihaylo, the chairperson of the board of directors of both Plaintiffs, Inter-Tel and Tech, received a "cold call-style" telephone call from Thomas Gipe ("Gipe") who introduced himself as an aircraft broker representing American (Dkt. No. 78, Mihaylo Deposition, pg. 27, SOF #24). The two discussed the possibility of one or both of Mihaylo's companies purchasing a corporate aircraft and/or selling any corporate aircraft that it may have owned (SOF #36). According to Gipe, Mihaylo indicated that his company was looking for a

---

[1] For the sake of brevity only, the Court will cite and make reference to Plaintiffs' Statement of Facts in Support of their Opposition to Defendant's Motion for Summary Judgment and In Support of Plaintiffs' Motion for Partial Summary Judgment ("SOF")(Dkt. No. 78). The Court has independently verified that any statement bolstered by an accompanying SOF citation has been alleged in deposition testimony, deposition exhibit, or sworn affidavit.

Learjet 31 ER, a twin turbojet corporate aircraft, one faster and with a greater range (SOF #34) than the current corporate aircraft that Tech owned, a Citation 500, turbo-prop aircraft (Dkt. No 78, Gipe Deposition, pp. 32-35).

In March of 2003, Gipe reported to Mihaylo that American had a potential buyer for Tech's Citation 500 aircraft. Gipe proposed that the Citation 500 be traded in to American in exchange for an available Learjet 31 ER, owned by Alice Walton of Wal-Mart fame (SOF #39, 40). The Learjet 31 ER Serial No. 31-017 ("Learjet") is the subject of this litigation (SOF #34). American obtained specifications and flight information about the Learjet and forwarded them to Mihaylo. Included in the information, American indicated that the Learjet had damage history. (Gipe Deposition, pg. 57-61, Dkt. No. 78, Deposition Exhibit "8", SOF #85).

On or about June 20, 2003, Mihaylo, along with Gipe and Paul, went to Bentonville, Arkansas to look at the Learjet and talk to the maintenance people at Wal-Mart Aviation in order to inspect the Learjet's records (SOF #88). At the time of the inspection, the maintenance personnel were working on a fuel tank leak that required the wings and side panels to be removed to address "corrosion issues" (Vennerbeck Deposition, pg. 18-19, SOF #45). During this visit, Gipe and Paul represented to Mihaylo that the aircraft had been completely rebuilt by Bombardier Aircraft in Canada after it had had a landing mishap. After the accident, the airplane had been disassembled, crated up, shipped off to Bombardier in Canada and rebuilt (SOF #44). Mihaylo reviewed computerized records for about 30-40 minutes; apparently without comprehension (SOF #46). According to the Defendants, Wal-Mart's personnel gave Mihaylo a computer disk containing more information about the history of the aircraft and its maintenance than is reported in Deposition Exhibit #8 (Patrick, pg. 31, 50-51, Dkt. No. 78, Deposition Exhibit "8"). Mihaylo told Gipe and Paul that he would require a thorough pre-purchase inspection to be done of the Learjet before any commitment would be made to purchase it (Dkt. No. 78, Mihaylo Deposition, pg. 42-43).

According to Evaschuk, a pre-purchase inspection for general aviation aircraft is a thorough physical examination of the entire aircraft designed to report an objective, impartial overview of the aircraft and its records. The maintenance facility conducting the pre-purchase

inspection is required to make a written summary of the specific findings from the examination. (SOF #132)

Mihaylo left Arkansas very interested in acquiring the Learjet, but wanted "prebuy inspection" of the airplane, in order to verify that the sales claims were accurate. (Dkt. No. 78, Mihaylo Deposition, pg. 42-43). Mihaylo wished Bombardier Service Center to perform the prebuy inspection (SOF #51). Gipe and Paul pivoted Mihaylo to "their sister company down in Florida, West Coast, that could do [the pre purchase inspection] quicker and probably less expensively" (Dkt. No. 78, Mihaylo Deposition, pg. 43). After receiving several telephone calls from Paul urging Tech to accept American's recommendation of West Coast as the entity to perform the pre-purchase inspection, Mihaylo agreed (SOF #52).

Commencing in late May of 2003, Rauchle became involved with Mihaylo in Tech's search for a Learjet (SOF #57). Prior to June 30, 2003, Paul and Gipe strongly urged Rauchle to utilize West Coast in Sarasota, Florida as the maintenance facility to perform the pre-purchase inspection on the Learjet (SOF #57). Rauchle's definition of a "pre-purchase inspection," a thorough inspection and review of the aircraft, its electrical systems, avionics, and logbooks by an objective third party to identify "squawks" associated with the aircraft and to determine airworthiness, came from subsequent conversations with Gipe (SOF #64).

On June 23, 2003, American submitted a proposed purchase agreement to Rauchle (Dkt. No. 78, Deposition Exhibit "9"). According to Rauchle, Tech wanted a number of changes in the contract (Rauchle Deposition, pg. 50). They were incorporated into the agreement signed by the parties (Dkt. No. 78, Deposition Exhibit "9").

On June 30, 2003, Tech and American entered into a letter of intent agreement, authored by Gipe, that contemplated Tech selling its Citation 500 to American as a trade-in and purchasing the Learjet 31. In the agreement, the parties agreed that the Learjet was being sold "as is, where is" (SOF #91, Dkt. No. 78, Deposition Exhibit "9"). Tech conditioned its obligation to close on certain "due diligence" criteria identified in §4(e) of the agreement. They were:

1. The Learjet's airframe and engine logbooks had to be complete.
2. American had to transfer title to the Learjet free and clear of liens.
3. Inter-Tel had the right to review and approve the aircraft's damage history.
4. The Learjet must be airworthy.

     5. Required maintenance must be up-to-date and in compliance with all service Bulletins and Airworthy Directives.
     6. The aircraft tendered to Tech must have all systems and equipment operation.

Furthermore, the parties agreed on additional terms and conditions:

1. American agreed to deliver the Learjet to West Coast Engineering at the Sarasota-Bradenton International Airport.
2. Tech had the right to have West Coast perform a pre-purchase inspection at Tech's expense.
3. Upon completion of the pre-purchase, Tech had the right to notify American of any conditions that rendered the aircraft not airworthy
4. American agreed to correct any noted airworthiness conditions up to a total cost of $10,000.00
5. Should the cost of correcting the noted conditions exceed $10,000.00, American could make those corrections at its option. If American choose not to make such corrections, then the earnest money deposited was to be refunded to Tech and the agreement was to be canceled.
6. Upon satisfactory completion of the pre-purchase inspection process, the earnest money deposit became non-refundable.

Tolbert claims he was directly involved in the sale of the Learjet from American to Tech to a minor extent and that Gipe and Paul were handling the sales transaction directly and would give Tolbert periodic progress reports (SOF #104).

     Shortly after the Learjet arrived in Florida, Tolbert telephoned Evaschuk at West Coast and told him the Learjet was in the process of being sold through American. In early July, 2003, several days after Tolbert's phone call, Evaschuk received a phone call from Gipe, who identified himself as American's salesman handling the Tech sale. During this and subsequent conversations, Gipe told Evaschuk American wanted certain repairs made to the Learjet, frequently making reference to the work as a pre-purchase inspection. Evaschuk requested Gipe to refrain from using the terminology "pre-purchase inspection", and said that any work done on the Learjet would have to take the form of a standard work order specifying certain maintenance (SOF #136).

     On July 31, 2003, Rauchle signed a work request wherein it was requested that West Coast perform the pre-purchase inspection (Dkt. No. 78, Rauchle Deposition, pg. 76).

     On August 15, 2003, during the due diligence period, Mihaylo asked American via email about the warranty for the work related to the fuel tank leak repairs completed by the third party

5

hired by Wal-Mart Aviation. Gipe informed Mihaylo that the warranty from the company that completed the fuel repair work would be transferred to Tech. The warranty ran for 120 days following completion of the work plus eight hours of flight time, and expired in November, 2003 (SOF #101).

On August 29, 2003, West Coast reported on the inspection and engines test and billed Tech for the work (Defendant's DX 26). Tech chose to complete the purchase. It notified American and the closing agent on September 4, 2003, when Rauchle faxed instructions to the closing agent (Defendant's DX 30).

On September 9, 2003, Gipe sent Rauchle a fax in which he confirmed that West Coast had completed its work on the Learjet. Gipe alleges that he does not know how he knew West Coast had done the work and never discussed the work on the Learjet with anyone at West Coast (SOF #98). West Coast never performed a logbook review or reviewed any of the aircraft records, logbooks, engine logs, or any other written records relating to the Learjet, and has never produced a document entitled "pre-buy inspection" for the Learjet (SOF #141). Additionally, West Coast has never researched, reviewed or checked the damage history of the Learjet, (SOF #140).

On September 15, 2003, Gipe represented to Rauchle that West Coat had returned the Learjet to American stating that the aircraft was airworthy (SOF #77). A Bill of Sale to the Learjet was delivered by American to Tech, and was recorded with the FAA on September 22, 2004 (Defendant's DX 32).

On October 18, 2003, Tech hired Robert Barron ("Barron") to pilot the aircraft from Sarasota to Phoenix (SOF #143). After being assured by Gipe that the aircraft was in working condition, Barron began a standard pre-flight inspection of the Learjet (SOF #144). There were many defects found during this inspection, most notably faulty oxygen pressure and autopilot systems (SOF #149, 150). Once the oxygen issue was successfully addressed, Barron piloted the Learjet away from Sarasota, confident that it was in airworthy condition (Dkt. No. 78, Barron Deposition, pg. 31). Over the next several days, Tech logged almost twenty (20) hours of flight time (Dkt. No 78, Barron Deposition, pg. 37). During those flights, Barron was alerted to severe aircraft defects. During one flight, he concluded that there were too many problems to allow the

aircraft to remain in the air, and took the Learjet directly to the Bombardier Manufacturing Facility in Tuscon, AZ (SOF #157).

On December 5, 2003, Lorne Shantz ("Shantz"), Chief Pilot responsible for all maintenance work done on the Learjet, called Gipe, complaining about his disappointment at the overall mechanical condition of the aircraft (SOF #162). During December 2003, Shantz was informed by Bombardier that numerous maintenance discrepancies had been discovered and that all or most of them should have been detected and resolved during the pre-purchase inspection process (SOF #168).

Before joining American as a salesperson in June of 2002, Gipe had no experience in aircraft sales nor did he have an FAA pilot or maintenance license, any aircraft mechanical training or background, or experience piloting an aircraft of any type (SOF #33).

Tech spent $157,241.60 for work, service or parts regarding the correction of maintenance deficiencies, systems failures and logbook deficiencies on the Learjet (SOF #171).

STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party..." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The evidence presented must be construed in favor of the non-moving party, and that party must receive the benefit of all favorable inferences that can be drawn from that party's evidence. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. If the determination of the case rests on which competing

version of the facts or events is true, the case should be submitted to the trier of fact. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree on the factual inferences that should be drawn from the facts. *Warrior Tombigbee Transportation Company v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). If any fact exists which could lead a fact-finder to find for the Plaintiffs, then the Defendant's Motion must be denied. *Transcontinental Ins. Co. v. Ice Sys. of Am.*, 847 F. Supp. 947, 949 (D. Fla. 1994). Conversely, if any fact exists which could lead a fact-finder to find for the Defendants, the Plaintiffs' Counter-Motion must be denied. *Id*.

DISCUSSION

I. Plaintiffs' Motion for Summary Judgment against Defendants

Plaintiffs request this Court to enter Summary Judgment on their behalf for counts I, VI, and VII of its first amended complaint. Plaintiffs' motion does not address the breach of fiduciary duty, negligence, breach of express warranty and breach of implied warranty claims contained in the first amended complaint.

Plaintiffs' first amended complaint alleges seven counts, on three of which they are requesting Summary Judgment: (I.) breach of contract; (VI.) fraud; and (VII.) violation of deceptive trade practices act. The Court will address the facts of each count in turn.

A. Breach of Contract (Count I.)

Plaintiffs claim that the Learjet's quality upon delivery was significantly less than what was contracted for. Each malfunction identified by Barron is a separate breach of the purchase agreements language that the Learjet be delivered with all systems and equipment operational. Furthermore, because the parties contracted for a condition that called for a valid "pre-purchase inspection" to be completed on the Learjet, American breached the contract when it knowingly failed to disclose that West Coast did not perform a "pre-purchase" quality inspection. Plaintiffs refute American's argument that Tech took delivery of the aircraft on October 18, 2003, thus waiving legal rights to pursue remedies in breach of contract, when Barron flew the Learjet from Sarasota to Phoenix. Because Barron was not a Tech employee, he had no authority to accept the aircraft under the terms of the purchase agreement. Plaintiffs point to Gipe's deposition, which

indicates that the Learjet was actually not delivered to Tech in the State of Florida. Thus, Plaintiffs request that summary judgment be granted in their favor for breach of contract.

American counters, claiming that the "as is, where is" provision of the purchase agreement required Tech to inspect the aircraft and terminate the agreement if not satisfied. If the aircraft failed to satisfy any of the contract conditions, American argues, Tech had a responsibility to terminate the purchase agreement and secure a return of its earnest money deposit. The contract language specifying that the Learjet be delivered with all systems and equipment operational does not relate to the condition of the aircraft, but provides Tech with different methods of contract termination. American maintains that Tech accepted delivery of the aircraft, nullifying its rights to terminate the contract. According to American, it is irrelevant whether Barron had the authority to accept the aircraft. Tech took delivery after it had reasonable opportunity to inspect the Learjet, retained possession, operated it, and made modifications to it. Moreover, American alleges that Tech was obligated to notify American that it wanted to rescind the transaction in order to revoke acceptance. Because Tech made no such revocation, acceptance is valid and the contract cannot have been breached.

The elements of a breach of contract in Florida are: 1) the existence of a contract; 2) breach thereof; and 3) damages flowing from the breach. *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042 (1st DCA 1977). An "as is" clause generally means that the buyer is purchasing property in its present state or condition. *Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991); *Lake Bluff Heating & Air Conditioning Supply, Inc. v. Harris Trust & Sav. Bank*, 117 Ill. App. 3d 284, 292, 452 N.E.2d 1361, 1367 (1983). The phrase implies that the property is taken with whatever faults it may possess and that the seller is released of any obligation to reimburse the purchaser for losses or damages that result from the condition of the property. *Jaffe*, 817 S.W.2d at 25. Furthermore, Fla. Stat. § 672.607 provides that acceptance of goods occurs when the buyer, after a reasonable opportunity for inspection, signifies to the seller that the goods are conforming or that he will take them in spite of their nonconformity. Fla. Stat. § 672.607(1). *B.P. Dev. & Management Corp. v. P. Lafer Enterprises, Inc.,* 538 So. 2d 1379, 1381 (Fla. 5th DCA 1989).

The contract at issue is the "Agreement to Purchase" document (Dkt. No. 78, Deposition Exhibit "9"). Both parties agree that the documents attached to the first amended complaint

constitute a contract. American makes no argument in any filed document that Tech did not suffer damages, if the contract was breached. It is uncontested that Tech spent $157,241.60 in additional work on the aircraft to bring into compliance with the terms of the contract. Thus, American has not raised a genuine issue of material fact as to elements 1 and 3 of a claim for breach of contract.

The sole remaining question relating to the breach of contract claim is whether American did, in fact, materially breach the contract. The contract contains an "as is, where is" provision that might lead a reasonable person to conclude that Tech contracted to take the Learjet in whatever condition it was in. However, the contract also contains references to specific quality that the Learjet must have been delivered in before the contract could be considered completed. The two possibilities are both reasonable and wholly incompatible. Furthermore, there is discrepancy as to what meaning the parties intended to give the contract provisions. American has alleged facts that indicate the intent was for the purchase agreement conditions to be individual rights of termination. However, Tech's proffered facts indicate that that the intent was for the purchase agreement conditions to be conditions precedent to the formation of a valid contract. A finding must be made as to the parties intended meaning. As a result, summary judgment as to Count I of the Plaintiffs' first amended complaint is improper.

B. Fraud (Count VI.)

Essentially, Plaintiffs' fraud claim centers around the misrepresentations that they claim Gipe and Paul made about West Coast and the pre-purchase inspection. Plaintiffs claim that Gipe and Paul induced them to use West Coast only after they represented that West Coast would be "extremely competent in doing pre-buy inspections" and that West Coast, American's sister company, had been used by American many times for pre-purchase inspections, in an attempt to steer Tech away from utilizing Bombardier in Arizona for the pre-purchase inspection. Tech points to deposition testimony by Gipe and Paul that indicate that these statements are untrue. Additionally, the Plaintiffs claim, prior to the signing of the contract, Gipe represented to Rauchle that the Learjet had complete airframe engineering, logbooks, and maintenance records and that all required technical services required by the FAA were up to date. The Plaintiffs allege that the record establishes that neither Gipe nor Paul had any idea as the time they made these

10

representations as to what the status of the logbooks or maintenance records were regarding the aircraft, and were made solely for the purpose of inducing Mihaylo and Rauchle to agree to purchase the aircraft.

American defends, claiming that any representations made by Gipe and Paul do not constitute words of actionable fraud because the generalized characterizations that the plane was in pristine condition was "sales puffing." Regardless, Tech could not have reasonably relied those characterizations because Mihaylo saw the plane in Bentonville undergoing repairs, and had access to the complete history of the aircraft, showing that the Learjet was in a condition less than pristine. Additionally, American claims that Tech knew of the problems with the airplane before and after the West Coast inspection, when Barron noted the plane's defects, so there can be no fraud. In response to the Plaintiffs' claim that Gipe and Paul's inducement was fraud, American contends that a speedily conducted, less expensive inspection motivated Tech's decision. Finally, American claims that Tech's damages can be traced only to West Coast's failure to perform the pre-purchase inspection, and not to Gipe and Paul's inducement.

Under Florida law, the essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation. *Wadlington v. Continental Med. Servs., Inc.*, 907 So. 2d 631, 632 (Fla. 4th DCA 2005); *Amazon v. Davidson*, 390 So. 2d 383, 385 (Fla. 5th DCA 1980); *Stowell v. Ted S. Finkel Inv. Servs., Inc.*, 641 F.2d 323, 325 (5th Cir. 1981). Generally, the issue of fraud is not properly the subject of summary judgment because a resolution of the issues involved requires an exploration of the relevant facts and circumstances, and, thus, a court can seldom determine the presence of fraud absent a trial or evidentiary hearing. *State Farm Mut. Auto. Ins. Co. v. Weiss*, 410 F. Supp. 2d 1146 (D. Fla. 2006) (citing *Robinson v. Kalmanson*, 882 So. 2d 1086, 1088 (Fla. 5th DCA 2004)). This is because the questions of actual misrepresentation, intent, knowledge, and reliance all turn on factual determinations, which are often based on circumstantial evidence. *State Farm*, 410 at 1146 (citing *Cohen v. Kravit Estate Buyers, Inc.*, 843 So.2d 989, 991 (Fla. 4th DCA 2003)). Furthermore, puffing is praising, extolling, or commending in inflated or extravagant terms and

11

is usually from interested motives. *Southwestern Bell Media, Inc. v. Spencer*, 1990 Okla. Civ. App. LEXIS 60 (Okla. Ct. App. 1990) (citing 12 The Oxford English Dictionary, 796 (2d ed 1989)). The exaggerated praise "is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer, and on which no reasonable man would rely." *Id*. (quoting W. Keeton, and W. Prosser, Prosser and Keeton on the Law of Torts, § 109 at 757 (5th ed 1984)).

Initially, this Court notes the ease of which a material issue of fact can be raised as to a claim of fraud. As the *Cohen* and *State Farm* courts noted, questions of actual misrepresentation, intent, knowledge, and reliance are subjective, fraud can almost never be the successful subject of a motion for summary judgment. *Cohen*, 843 So.2d at 991. *State Farm*, 410 at 1146. Concerning Tech's first fraud claim, it is entirely possible that Gipe's and Paul's statements were merely sales puffing and not factual representations. Determination requires an investigation into the intent and understanding of the individuals involved. A question of intent is always a matter for fact-finder resolution. Furthermore, a reasonable fact-finder could conclude that Mihaylo knew that the Learjet was not in "pristine" condition after his inspection in Arkansas, despite the Plaintiffs' claim that Mihaylo did not understand what he was looking at or the information contained in the Learjet's damage history. Because the Defendants raise a material issue of fact as to the first fraud element, summary judgment is not proper.

Concerning Tech's second fraud claim, American has raised a material issue of fact as to whether it was Gipe and Paul's statements that actually induced Tech into hiring West Coast, the third element necessary to establish fraud. According to Mihaylo's deposition, Gipe stated that American's "sister company" could perform the work better, faster, and cheaper. It is entirely reasonable that Tech made their decision to hire West Coast because Gipe represented that West Coast was used in many pre-purchase inspections. It is also entirely reasonable that Tech made their decision based upon other factors, such as time and cost.  A fact-finder must ascertain why Mihaylo and Rauchle hired West Coast. American has raised a material issue of fact as to the third element of fraud. As a result, summary judgment as to Count VI of the Plaintiffs' first amended complaint is improper.

C. Violation of Deceptive Trade Practices Act (Count VII.)

Plaintiffs argue that the events and fact that give rise to its fraud claim (set forth above) also give rise to a claim under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Defendants counter, arguing that it made the West Coast recommendation in good faith and, therefore, cannot be judged deceptive.

FDUTPA provides a private right of action for unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in conducting any trade or commerce. Fla. Stat. § 501.204. The act makes unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). *Gritzke v. M.R.A. Holding, LLC*, 2003 U.S. Dist. LEXIS 9307 (D. Fla. 2003). Engaging in fraud is an unfair and deceptive trade practice that constitutes a "violation of this part." *Motmanco, Inc. v. McDonald's Corp.,* 2005 U.S. Dist. LEXIS 33965 (D. Fla. 2005). When addressing a deceptive or unfair trade practice claim, the issue is not whether the plaintiff actually relied on the alleged practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances. *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000). A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue. *Id*. at 973.

Initially, this Court notes that American has provided nothing to suggest that acting in good faith would, as a matter of law, defeat a claim under the Florida Deceptive and Unfair Trade Practices Act. However, Plaintiffs point to American's alleged fraudulent misrepresentation as the basis for its FDUTPA claim. Before any violation of FDUTPA can occur, a determination of fraud must be made. This Court has already ruled that the Plaintiffs' facts alleging fraud are open to different interpretations that require fact-finder determination. As a result, summary judgment as to Count VII of the Plaintiffs' first amended complaint is improper.

II. Defendant American's Supplement to its Memorandum in Response to Tech's Motion for Summary Judgment and its Opposition to American's Motion

Defendants assert that Evaschuk's affidavit is, at best, misleading. According to American, Evaschuk knew that he was performing a pre-purchase inspection and actually performed a pre-purchase inspection, but with a different label. If true, these facts would contradict Evaschuk's affidavit testimony. Defendants claim that Evaschuk's deposition testimony suggests he offered to sign an affidavit that laid factual blame at American's proverbial feet, if Tech agreed to release Evaschuk as a co-defendant in this action. American claims that Tech accepted Evashuk's offer. American goes as far as to suggest that the affidavit was written by counsel for Tech, asserting "counsel for [Tech] appears to be the person who put the words into Evaschuk's mouth…"

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact-finder  evaluating the evidence could draw more than one inference from the facts, and, if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988)).

This information has been brought to this Court's attention via American's response supplement to Plaintiffs' motion for partial summary judgment. American does not request this Court take any specific action in its supplement memorandum. This Court can only use this new information to complement the arguments contained in American's original response. Having already found Tech's claims of summary judgment warrantless, this supplement seems unnecessary. Evaschuk's deposition testimony merely adds to the tremendous volume of material issues of fact already alleged. As the *Sholtz* and *Samples* courts suggested, conflicts in testimony and all inferences contained therein are for a fact-finder  to weigh.  *Shotz,* 344 F.2d at 1164. *Samples,* 846 F.2d at 1330. Thus, a fact-finder  must decide which, if any, of Evaschuk's testimony is credible.

CONCLUSION

Thus, it is clear, having read the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits that Defendant American has raised genuine issue of material fact as to the Plaintiffs' claims for breach of contract, fraud, and violation of Florida's deceptive and Unfair Trade Practices Act. Accordingly, it is:

**ORDERED** that Plaintiffs Inter-Tel, Inc.'s and Inter-Tel Tech, Inc.'s motion for partial summary judgment on its first amended complaint and accompanying memorandum of points and authorities in support of their motion for partial summary judgment (Dkt. Nos. 73 and 74) be **DENIED.**

**DONE AND ORDERED** in Chambers at Tampa, Florida, this 15th day of November, 2006.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record